UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES D. KATZ<br><br>Defendant | Criminal No.   25cr10407<br><br>Violations:<br><br>Count One:   Conspiracy to Defraud the United States<br>(18 U.S.C. § 371)<br><br>Counts Two and Three:   Loan Fraud<br>(18 U.S.C. § 1014)<br><br>Conspiracy to Defraud Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(2))<br><br>Loan Fraud Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461) |

INFORMATION

At all times relevant to this Information:

General Allegations

1.      Defendant CHARLES D. KATZ lived in Sudbury, Massachusetts, where he worked as a Certified Public Accountant.   He owned CD Katz LLC ("CDK"), a firm that provided financial advice and tax preparation services to businesses and individuals, and co-owned Gebsco Realty Corporation ("Gebsco"), a real estate investment and management company.

2.      Co-conspirator 1 ("CC-1") lived in Marlborough, Massachusetts.   Starting no later than about 2013, CC-1 worked at CDK as the Director of Corporate Services and purportedly earned between $51,200 and $81,000 annually from 2013 to 2023.   Starting no later than 2013, CC-1 also worked for Gebsco as its Chief Operating Officer, but until 2023, CC-1 was not on Gebsco's payroll.

1

3. No later than about 2014, CC-1 and KATZ agreed that CDK and Gebsco would compensate CC-1 off the books by, among other things, paying members of CC-1's family, providing rent-free housing to his family, paying for his children's college tuition, and paying for personal expenses that CC-1 and a family member charged on Gebsco's and CDK's corporate credit cards.

4. KATZ hid CC-1's true compensation by not reporting it on CDK's or Gebsco's income or employment tax filings and by not issuing any Form W-2 or Form 1099 to CC-1 that accurately recorded CC-1's actual taxable compensation.

5. CC-1 hid his true compensation by filing false personal income tax returns.

6. Through this scheme, KATZ and CC-1 avoided reporting at least $1,668,487 in off-the-books compensation to CC-1 to the Internal Revenue Service ("IRS"). As a result, CC-1 and KATZ did not pay income and employment taxes on CC-1's true compensation and caused the IRS and the Commonwealth of Massachusetts to suffer a tax loss of at least $835,105.

7. In 2020, when the COVID-19 pandemic broke out, KATZ applied for pandemic relief loans for CDK and Gebsco. In each instance, KATZ falsely certified, despite being engaged in a multi-year tax fraud, that he was not engaged in federal crimes. Based on KATZ's false certifications, CDK and Gebsco fraudulently received a total of $179,900 in pandemic relief funds. KATZ used at least some of the proceeds to fund CC-1's off-the-books compensation.

<u>Obligations to the Internal Revenue Service</u>

8. The IRS was responsible for administering and enforcing the tax laws of the United States, collecting taxes owed by its citizens and businesses to the United States Treasury, and providing refunds of overpaid taxes.

9. Domestic corporations generally were required to file annual income tax returns,

regardless of whether they had any taxable income, either as S Corporations or C Corporations.

10. S Corporations were closely held companies that chose to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code. S Corporations were required to file annual United States Income Tax Returns for S Corporations Form 1120S ("Form 1120S") to report their annual gross receipts or sales, expenses, and resulting income or loss. Deductible expenses included, among other things, employee salaries and wages; pensions and profit-sharing plans; and employee benefit programs. S Corporations could elect to "pass through" any profits or losses to their shareholders for federal tax purposes. Such shareholders were then required to include their share of an S Corporation's income or loss on their individual income tax return, Form 1040, using a "Schedule K-1" and to pay any tax due as a result.

11. C Corporations were required to file annual United States Corporations Income Tax Returns, Form 1120 ("Form 1120") to report the income; deductions, gains, and losses from their operations. Deductible expenses included, among other things, employee salaries and wages; pensions and profit-sharing plans; and employee benefit programs. C Corporations were taxed separately from their owners.

12. Limited Liability Companies ("LLCs") were entities created by state statute. The IRS treated LLCs either as corporations, partnerships, or as part of their owners' tax returns (a "disregarded entity"), depending on the LLCs' size and its members' elections. For income tax purposes, LLCs with only one member were treated as entities disregarded as separate from their owners, unless the LLCs filed Form 8832 and affirmatively elected to be treated as corporations. If single-member LLCs did not elect to be treated as corporations, the LLCs were "disregarded entities,", and their activities had to be reflected on their owners' federal tax returns. If the owners were individuals, the LLCs' activities were generally reflected on Form 1040 Schedule C, Profit

3

or Loss from Business ("Form 1040 Schedule C").

*CDK & Gebsco*

13. CDK filed its taxes on KATZ's Form 1040 Schedule C.

14. Before 2016, Gebsco filed its taxes as a C Corporation using Form 1120. After 2016, Gebsco filed its taxes as an S Corporation using Form 1120S.

*FICA Taxes*

15. The tax code required businesses to withhold certain taxes from their employees' paychecks and pay those taxes over to the IRS. These federal employment taxes consisted of federal income tax and Federal Insurance Contribution Act taxes ("FICA taxes").

16. In general, the tax code required employers to deduct and withhold income taxes on the amount of wages actually or constructively paid to employees and to pay over those withholding taxes to the IRS.

17. FICA taxes consisted of two elements: Social Security taxes, which were used to fund retirement and disability benefits, and Medicare taxes, which were used to provide health and medical benefits for the aged and disabled. Employers were required to deduct and withhold FICA taxes on the amount of wages actually or constructively paid to employees and to pay over those FICA taxes to the IRS. Employers were also responsible for paying their own FICA taxes based on the wages paid to their employees. The employee portion of FICA taxes, along with federal withholding taxes, were collectively referred to as "Trust Fund Taxes." Trust Fund Taxes and the employer's matching FICA taxes were collectively referred to as "employment taxes."

18. Federal tax law required employers to file Form 941s, Employers Federal Quarterly Tax Returns ("Form 941"), which employers used to report and pay all Federal payroll taxes. Federal tax law required employers to file Form 941 four times per year, one for each quarter

4

ending March 31, June 30, September 30, and December 31. Employers were required to pay over payroll taxes to the IRS, in full, by the due date of the Form 941.

19. Section 7501 of the Internal Revenue Code provided that whenever any person was required to withhold or collect any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so withheld or collected was to be held in trust on behalf of the United States.

20. In addition, employers were generally to file and provide to employees a United States Wage and Tax Statement, Form W-2 ("Form W-2"), to report, among other things, total wages, tips, and other compensations, including fringe benefits, and to report income tax withheld from employees and paid to the IRS.

21. In addition, employers were generally required to file and provide Forms 1099 to any independent contractor to whom the employer paid more than $600.

22. Any individual who was employed in the United States and earned income during a calendar year in excess of a threshold amount, was obligated to file a United States Individual Income Tax Return, Form 1040 ("Form 1040") with the IRS for that calendar year and was required to report earnings recorded on Form W-2 and on Form 1099, in addition to other earnings.

23. All Forms 941, 1040, 1120, and 1120S required the filer to sign an attestation under penalty of perjury that the return and accompanying schedules were true, correct, and complete.

24. KATZ was responsible for accurately collecting, accounting for, and paying taxes over to the IRS. He was also responsible for preparing, and causing to be prepared, accurate business Income Tax Returns (Form 1040 Schedule C, Form 1120 or 1120S) and payroll tax returns (Form 941) for CDK and Gebsco and for issuing Forms W-2 and 1099 to employees and independent contractors of both companies.

25.     CC-1 was responsible for accurately reporting his taxable income to the IRS and paying all taxes due and owing.

### The Paycheck Protection Program

26.     The Paycheck Protection Program ("PPP") was a COVID-19 pandemic relief program administered by the Small Business Administration ("SBA") that provided forgivable loans to small businesses for job retention and certain other expenses.  The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic.

27.     To obtain a PPP loan, a qualifying business had to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors and that the applicant was "not engaged in any activity that is illegal under federal, state or local law."  A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents.

28.     PPP loan applications were electronically submitted or caused to be submitted by the borrower and received by the SBA.  Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business.

29.     The proceeds of a PPP loan could be used for certain specified items, such as payroll costs or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by

the borrowers to purchase consumer goods, automobiles, personal residences, clothing, or jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

30. Bank A was a third-party participating lender in the PPP and a federally insured financial institution as defined in 18 U.S.C. § 20.

### The Conspiracy

31. From about 2014 to at least 2023, CC-1 and KATZ agreed that KATZ would pay CC-1 off the books for CC-1's work at Gebsco and CDK and thereby not accurately report CC-1's full compensation on federal tax forms.

### Objects and Purposes of the Conspiracy

32. The object of the conspiracy was to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, that was: (1) income taxes, by filing false corporate income tax returns, which did not accurately report compensation paid to CC-1; (2) federal payroll taxes, by filing false and fraudulent Employer's Quarterly Federal Tax Returns, which underreported the true number of employees and the true and correct wages paid to CC-1 and failed to pay over the appropriate taxes; and (3) income taxes, by issuing false Forms W-2 that CC-1 used to prepare fraudulent Form 1040s, all in violation of Title 26, United States Code, Sections 7201, 7202, and 7206.

33. The principal purpose of the conspiracy was to compensate CC-1 tax free and thereby enrich CC-1, while lessening CDK's and Gebsco's tax obligations.

### Manner and Means of the Conspiracy

34. Among the manner and means by which KATZ and CC-1 carried out the conspiracy

were the following:

    a.    Buying a home for CC-1's ex-wife to live in rent-free;

    b.    Paying home expenses for CC-1's ex-wife;

    c.    Paying college-related expenses for CC-1's children;

    d.    Paying CC-1's ex-wife and daughter in lieu of paying CC-1;

    e.    Paying personal expenses incurred by CC-1 and his ex-wife on Gebsco's and CDK's corporate credit cards;

    f.    Paying for CC-1's personal driver; and

    g.    Filing false tax forms for CDK and for Gebsco that did not accurately report CC-1's compensation.

### Overt Acts in Furtherance of the Conspiracy

35.    From in or about 2014 through in or about 2023, KATZ and CC-1 committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

    a.    On or about January 22, 2015, Gebsco paid CC-1's ex-wife $3,450;

    b.    On or about June 12, 2015, CDK paid CC-1's daughter $595;

    c.    On or about November 17, 2015, Gebsco bought a house in Sudbury for $585,000 for CC-1's ex-wife to live in rent-free;

    d.    On or about April 15, 2016, CC-1 filed a Form 1040 for the tax year 2015 that did not accurately report the income he received.

    e.    On or about December 23, 2016, Gebsco paid CC-1's daughter $2,975, in increments of $595, out of five accounts, to conceal payments made on behalf of CC-1 and to avoid detection by the IRS on a Form 1099 required for payments over $600;

f.    On or about February 26, 2016, KATZ executed and filed a Form 1096, Annual Summary and Transmittal of United States Information Returns, for Gebsco for 2015 that falsely did not include CC-1's true earnings;

g.    On or about April 21, 2016, Gebsco paid CC-1's ex-wife $2,950;

h.    On or about March 6, 2017, Gebsco paid CC-1's ex-wife $1,000;

i.    On or about January 3, 2018, KATZ paid CC-1's daughter $2,975 in increments of $595, out of five accounts, to conceal payments made on behalf of CC-1 and to avoid detection by the IRS on a Form 1099 required for payments over $600;

j.    On or about January 17, 2018, KATZ filed a Form 941 for Gebsco for the fourth quarter of 2017 that falsely did not report accurately the number of employees, compensation to CC-1, and Gebsco's employment tax liability;

k.    On or about February 7, 2019, KATZ and CC-1 agreed to sell the house in Sudbury, with profits to be for the benefit of CC-1's ex-wife, with Gebsco increasing her profit margin by $2,500 per month for every month that CC-1 worked at Gebsco after January 1, 2018;

l.    On or about April 16, 2019, KATZ filed a Form 941 for Gebsco for the first quarter of 2019 that falsely did not report accurately the number of employees, compensation to CC-1, and Gebsco's employment tax liability;

m.    On or about September 16, 2019, Gebsco paid CC-1's ex-wife $1,200;

n.    On or about July 7, 2020, Gebsco paid CC-1's ex-wife $1,000;

o.    On or about October 13, 2020, KATZ filed a Form 941 for Gebsco for the third quarter of 2020 that falsely did not report accurately the number of

9

        employees, compensation to CC-1, and underreported Gebsco's employment tax liability;

p.     On or about January 13, 2021, CC-1 paid $2,713.80 from Gebsco to a Connecticut university for tuition for CC-1's son;

q.     On or about April 20, 2021, KATZ filed a Form 941 for Gebsco for the first quarter of 2021 that did not report accurately the number of employees, compensation to CC-1, and Gebsco's employment tax liability;

r.     On or about February 15, 2022, CC-1 paid $5,088 from Gebsco to a Connecticut university for tuition for CC-1's son;

s.     On or about April 14, 2022, KATZ filed a Form 941 for Gebsco for the first quarter of 2022 that falsely did not report accurately the number of employees, compensation to CC-1, and Gebsco's employment tax liability;

t.     On or about July 15, 2023, CC-1 paid $3,309 from Gebsco to a Connecticut university for tuition for his son; and

u.     On or about October 12, 2023, KATZ filed a Form 941 for Gebsco for the third quarter of 2023 that falsely did not report the accurate compensation to CC-1 and underreported Gebsco's employment tax liability.

### The PPP Fraud

36.     On or about April 2, 2020, KATZ filled out, signed, and submitted a PPP loan application to Bank A to obtain a PPP loan to Gebsco in the amount $142,500.

37.     As part of the Gebsco PPP application, KATZ falsely certified that as the applicant, he was not engaged in any activity that was illegal under federal law, when, in fact, he was then

10

helping CC-1 to evade income taxes and evading employment taxes on the under-the-table compensation he was paying to CC-1.

38. In support of the Gebsco PPP application, KATZ provided false payroll documents to Bank A, including false Forms 941 for tax year 2019 that did not include off-the-books compensation paid to CC-1.

39. On or about April 3, 2020, KATZ filled out, signed, and submitted a PPP loan application to Bank A to obtain a PPP loan to CDK in the amount $37,400.

40. As part of the CDK PPP application, KATZ falsely certified that as the applicant, he was not engaged in any activity that was illegal under federal law, when, in fact, he was then helping CC-1 to evade income taxes and evading employment taxes on the under-the-table compensation he was paying to CC-1.

41. In support of the CDK PPP application, KATZ provided Bank A false payroll documents, including false Forms 941 for tax year 2019 that did not include an accurate statement of compensation paid to CC-1.

42. In 2020, KATZ paid CC-1 at least $174,608.33 in off-the-books compensation, causing the IRS a tax loss of at least $77,799.

43. On or about June 16, 2021, CC-1, acting as Gebsco's Chief Operating Officer, filled out, signed, and submitted a PPP loan forgiveness application for the $142,500 PPP loan to Gebsco.

44. On or about June 28, 2021, the SBA forgave the $142,500 PPP loan to Gebsco.

45. On or about July 9, 2021, KATZ filled out, signed, and submitted a PPP loan forgiveness application for the $37,400 PPP loan to CDK.

46. On or about July 16, 2021, the SBA forgave the $37,400 PPP loan to CDK.

<u>COUNT ONE</u>
Conspiracy to Defraud the United States
(18 U.S.C. § 371)

The United States Attorney charges:

47. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 46 of this Information.

48. From in or about 2014 through in or about 2023, in Sudbury, in the District of Massachusetts, the defendant,

CHARLES D. KATZ,

conspired with others known to the U.S. Attorney to defraud the United States, that is, to impede, impair, obstruct, and defeat the lawful function of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of income taxes and employment taxes.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO AND THREE
### False Loan Application
### (18 U.S.C. § 1014)

The U.S. Attorney charges:

49. The U.S. Attorney re-alleges and incorporates by reference paragraphs 1 through 46 of this Information.

50. On or about the dates listed below, in Sudbury, in the District of Massachusetts, the defendant,

### CHARLES D. KATZ,

knowingly made a false statement and report for the purpose of influencing in any way the action of Bank A, an institution the accounts of which were insured by the Federal Deposit Insurance Corporation, and of the United States Small Business Administration, upon any application or loan, to wit, applications for Paycheck Protection Program loans:

| Count | Approximate Date | Description |
|---|---|---|
| 2 | April 2, 2020 | PPP Application for Gebsco |
| 3 | April 20, 2020 | PPP Application for CDK |

All in violation of Title 18, United States Code, Section 1014.

13

LOAN FRAUD FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

51.     Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1014, set forth in Counts 2 and 3, the defendant,

CHARLES D. KATZ,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, the following asset:

   a. $179,500, to be entered in the form of a forfeiture money judgment;

52.     If any of the property described in Paragraph 53, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 53 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

14

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/Kriss Basil
      KRISS BASIL
      Assistant United States Attorney